1

Bright Harry
37421 Gillett Road
Fremont, CA 94536
bharry77@hotmail.com
(510) 396-7128
*Pro Se*

Ronald S. Draper
5678 Hughes Place
Fremont, CA 94538
ronsdraper@att.net
(510) 795-7524
*Pro Se*

*FILED*

OCT 13 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Bright Harry

and

Ronald S. Draper

**Plaintiffs,**

vs.

_____,

KCG Americas LLC ("KCG"),

Daniel B. Coleman, CEO of KCG

Carl Gilmore, Director of KCG Futures

Greg Hostetler, KCG Compliance Officer

Main Street Trading, Inc. ("MST"),

Patrick J. Flynn, President of MST

Wedbush Securities Inc. ("Wedbush")

Edward W. Wedbush, President of Wedbush

ION Trading, Inc. ("ION")

Andrea Pignataro, CEO of ION, Global

Robert Sylverne, CEO of ION, USA

Computer Voice Systems, Inc. ("QST")

Paul Sturm, CEO of QST and

Scott William Benz, VP of QST

**Defendants**

**Case Number: CV20 7352 SK**

**HARRY'S AND DRAPER'S COMPLAINT FOR:**

**1. VIOLATIONS OF 18 U.S.C. § 1962(C)–(D): THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**2. FINANCIAL ABUSE OF ELDER DRAPER**
**3. FRAUDULENT CONCEALMENT UNDER CALIFORNIA LAW**
**4. FRAUDULENT MISREPRESENTATIONS UNDER CALIFORNIA LAW**
**5. VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW**
**6. FRAUD IN VIOLATION OF 7 U.S.C. § 6b**
**7. FRAUD IN VIOLATION OF CEA § 6(c)(1)**
**8. VIOLATIONS OF CALIFORNIA UNLAWFUL ACTIVITY & FRAUDULENT CONDUCT LAW**
**9. VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**10. VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**11. BREACH OF OBLIGATION WITHOUT, AND WITH CONTRACT UNDER CALIFORNIA LAW**
**12. BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW**

**Federal Statutes:**
7 U.S.C. § 6b, 7 U.S.C. §2(a)(1)(B), 7 U.S.C. § 25, CEA § 6(c)(1) and 18 U.S.C. § 1962(C)–(D)
**California Statutes:**
CCC §1572, CCC §1573, CCC §1709, CCC §1710, CCC §3294, CCC §3333 and Corp. 29536
**NFA Rules:**
Rules 2-2, 2-4, 2-9, 2-26, 2-29, 2-30, 2-38

# JURY TRIAL DEMANDED

# TABLE OF CONTENTS

| No. | Description | Page |
|---|---|---|
| **SUMMARY OF THE COMPLAINT** | | 5 |
| **JURISDICTION** | | 10 |
| **VENUE** | | 11 |
| **INTRADISTRICT ASSIGNMENT** | | 11 |
| **PARTIES** | | 11 |
| | A. Plaintiffs | 11 |
| | B. Defendants | 12 |
| | C. Other Parties of Interest | 16 |
| **I.** | **BACKGROUND** | 16 |
| | A. Plaintiffs Harry-Draper Trading Partnership ("HDTP") California Joint Venture | 16 |
| | B. Arithmetic Spreads and Exchange-Traded Spreads | 17 |
| | C. Plaintiffs' Commodity Futures Trading Business Activities | 19 |
| | D. Defendants' Business Activities | 19 |
| | E. Defendants KCG and Wedbush are Clearing Futures Commission Merchants | 21 |
| | E1. *FCMs' Duties to their Futures Trading Customers with Regards to Electronic Trading* | 22 |
| | E2. *7 U.S.C. § 4 imposes Respondeat Superior Liability upon FCMs for acts proscribed by the CEA* | 23 |
| | E3. *Clearing FCMs KCG's and Wedbush's statutory obligations and responsibilities, especially in regards to Electronic Trading Facilities* | 23 |
| | F. The Legal and Technology Challenges Posed by Electronic Trading in Commodity Futures and the U.S. Regulatory Response Thereto | 27 |
| **II.** | **FACTUAL ALLEGATIONS** | 27 |
| | A. THE ELECRONIC TRADE MANIPULATION FRAUD ENTERPRISE | 27 |
| | A1. MICK Joint Enterprise | 27 |
| | A2. CWIM Joint Enterprise | 29 |
| | B. ETMF ENTERPRISE DEFENDANTS' FRAUDULENT CONCEALMENT, MISREPRESENTATIONS, DECEITS AND INDUCEMENT | 31 |

B1. Scott William Benz ("Benz") Made False Statements and Concealed Material Facts from Plaintiffs To Induce and Induced Plaintiffs To Move Their Account to Defendants..................................................................... 36

B2. Patrick Joseph Flynn ("Flynn") Made False Statements and Concealed Material Facts From Plaintiffs To Induce and Induced Plaintiffs To move Their Account to Defendants..................................................................... 37

B3. Flynn, Gilmore and Hostetler knowingly and intentionally failed to furnish Plaintiffs with the FCM Disclosure Documents before opening Plaintiffs' Futures Account at KCG........................................................... 36

B4. Flynn, Gilmore and Hostetler knowingly and intentionally failed to furnish Plaintiffs with the FCM disclosure documents before moving Plaintiffs' Futures Account to Wedbush................................................... 38

C. DEFENDANTS' FRAUDULENT MISREPRESNTATIONS THROUGH FALSE ADVERTISEMENTS ON THEIR RESPECTIVE WEBSITES............ 40

C1. Defendant Wedbush's False Website Advertisements............................. 40

C2. Defendant KCG's False Website Advertisements..................................... 41

C3. Defendant ION's False Website Advertisements....................................... 42

C4. Defendant QST's False Website Advertisements....................................... 43

C5. Defendant MST's False Website Advertisements...................................... 45

D. DEFENDANTS' BREACH OF OBLIGATION......................................... 47

D1. With Contract Under California Law....................................................... 47

D2. Without Contract Under California Law................................................... 48

E. DEFENDANTS' BREACH OF FIDUCIARY DUTY....................................... 49

F. DEFENDANTS' FINANCIAL ELDER ABUSE (DRAPER)............................. 53

Flynn of MST and Przybylski of KCG had knowledge of the fact that Draper was a retired elderly man, over the age of 65, as of November 6, 2013.................................................................................................. 54

III  DEFENDANTS' OPERATIONAL FAILURES/RACKETEERING ACTIVITIES............................................................................................. 54

G. CONSISTENT PATTERN OF OPERATIONAL FAILURES OF DEFEND-ANTS' ELECTRONIC TRADING FACILITY PROVE DEFENDANTS' FRAUDULENT MISREPRESENTATIONS, FRAUDULENT CONCEAL-MENT, FRAUDULENT DECEITS AND FRAUDULENT INDUCEMENT... 54

G1. Defendants' Operational Failures/Racketeering Activities in 2013.......... 54

G2. Defendants' Operational Failures/Racketeering Activities in 2014.......... 58

G3.   Defendants' Operational Failures/Racketeering Activities in 2015.......... 63

H.   MISREPRESENTATION,S CONCEALMENT, DECEITS AND INDUCE-MENT, AND SUBSEQUENT HISTORY............................................................. 70

IV.   **CAUSES OF ACTION**................................................................................. 95

A.   FIRST CAUSE OF ACTION: Violations of RICO, 18 U.S.C. § 1962(c), Against All Defendants except Wedbush and Edward W. Wedbush.................. 95

A1.   The Electronic Trade Manipulation Fraud ("ETMF") Enterprise............ 96

A2.   Pattern of Racketeering Activity.....................................................100

A3.   Scienter........................................................................................113

A4.   Causation......................................................................................113

B.   SECOND CAUSE OF ACTION: Violations of RICO, 18 U.S.C. § 1962(c), Against All Defendants except KCG and Coleman............................................. 114

C.   THIRD CAUSE OF ACTION: Conspiracy to Violate the Racketeers Influenced and Corrupt Organizations Act ("RICO"), (18 U.S.C. § 1962(d)).... 127

C.   FOURTH CAUSE OF ACTION: Financial Abuse of Elder Draper (California Welfare and Institutions Code Sections 15600, et seq.)..................................... 131

D.   FIFTH CAUSE OF ACTION: Fraudulent Inducement, Misrepresentations and Concealment (Cal. Civ. Code §§ 1709 and 1710, et seq)................................... 135

E.   SIXTH CAUSE OF ACTION: Fraudulent Misrepresentations through False Advertisements (Cal. Civ. Code §§ 1709 and 1710, et seq)............................... 137

F.   SEVENTH CAUSE OF ACTION: Fraud in violation of Section 4b(a)(2)(A) and (C) of the CEA or 7 U.S.C. § 6b (2012)......................................................... 140

G.   EIGHTH CAUSE OF ACTION: Fraud in violation of CEA Section 6(c)(1) (Employment of manipulative Devices, artifices, and scheme to defraud)......... 141

H.   NINTH CAUSE OF ACTION: Violations of the California Unlawful Act and Fraudulent Conduct Law (Cal. Corp. Code § 29536 *et seq.*)........................... 142

I.   TENTH CAUSE OF ACTION: Violations of the California Unfair Competition Law (CAL. BUS. & PROF. CODE § 17200 *et seq.*))..................... 144

J.   ELEVENTH CAUSE OF ACTION: Violations of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*)..................................... 145

K.   TWELFTH CAUSE OF ACTION: Breach of Obligation (1) with Contract and (2) without Contract (Cal. civ. Code §§ 1709, 1710, 3294, 3300 and 3333) 148

L.   THIRTEENTH CAUSE OF ACTION: Breach of Fiduciary Duty (Cal. Civ. Code §§ 1709, 3294 and 3333)............................................................................. 152

V.   **PLAINTIFFS' EXPLANATION OF AMOUNT OF DAMAGES CLAIMED AND METHOD OF CALCULATING THESE DAMAGES**............................... 154

| VI. | CONCLUSION | 160 |
|---|---|---|
| VII. | DEMAND FOR RELIEF | 161 |
| VIII. | DEMAND FOR JURY TRIAL | 162 |
| IX. | EXHIBITS | 163 |
| | T11 | * |
| | T12 Operational Failures | * |
| | T15(a) Total Damage Claims | * |
| | T15(b) | * |
| | T26(a) | * |
| | T26(b) | * |

Plaintiffs Bright Harry ("Harry") and Ronald S. Draper ("Draper"), or Harry-Draper Trading Partners ("HDTP") by their own experiences, investigations, and information and belief, allege with particularity pursuant to Fed. R. Civ. P. 9(b), as follows:

# SUMMARY OF THE COMPLAINT

1. This action is about the Electronic Trade Manipulation Fraud (ETMF) Enterprise Defendants' Intentional Fraudulent Concealment of their defective and dysfunctional Electronic Trading Facility they fraudulently touted or represented to Plaintiffs as superior, fully functional, tightly integrated and seamlessly connected to the Commodity Futures Exchanges like CME/Globex, CBOT and ICE, to deceive and induce, and deceived and induced Plaintiffs Draper and Harry to move their successful Futures Trading Account from OEC/Daniels Trading (Plaintiffs' Former Broker) to the ETMF Enterprise Defendant KCG and later, ETMF Enterprise Defendant Wedbush, both Clearing FCMs, to defraud Plaintiffs, and defrauded Plaintiffs. The Fraudulent Concealment, Fraudulent Misrepresentations, Fraudulent Deceits and Fraudulent Inducement by the two ETMF Enterprise snake-oil Salesmen-Defendants, Scott William Benz ("Benz") of QST and Patrick J. Flynn ("Flynn") of MST were very effective and successful against Plaintiffs because their representations were corroborated by the phenomenal performance of the ETMF Enterprise Defendants' Demo Trading Platform ("DEMO"). The ease and simplicity of creating exchange-traded Futures Spreads and Futures

Spread Charts, and the speed of execution of Plaintiffs' electronic trade orders through the Simulated or Virtual Futures Exchanges was lightning fast in the DEMO. Benz and Flynn used this phenomenal performance of the DEMO to finally induce Plaintiffs to move their Futures Trading Account to the ETMF Enterprise Defendants, and the following are the ETMF Enterprise Defendants.

***The Five Corporate Defendants are all Jointly and Severally Liable as a Joint Enterprise, the "ETMF Enterprise", through which the Nine Individual Defendants Carried Out their Misconducts to Defraud Plaintiffs Draper and Harry***

2. The ETMF Enterprise Defendants include the 5 (five) Corporate Defendants Wedbush Securities Inc. ("Wedbush"), ION Trading, Inc. ("ION"), Main Street Trading, Inc. ("MST"), Computer Voice Systems, Inc. ("QST") and KCG Americas LLC ("KCG"), and 9 (nine) Individual Defendants (Daniel B. Coleman, Carl Gilmore, Greg Hostetler, Edward W. Wedbush, Andrea Pignataro, Robert Sylverne, Paul Sturm, Scott William Benz and Patrick J. Flynn. The 5 Corporate Defendants operated as MICK Joint Enterprise and CWIM Joint Enterprise, within the Umbrella RICO Enterprise, the Electronic Trade Manipulation Fraud ("ETMF") Enterprise, and thus, are jointly and severally liable for the misconducts alleged in Plaintiffs' Complaint.

3. Defendants Daniel B. Coleman, Carl Gilmore, Greg Hostetler, Edward W. Wedbush, Andrea Pignataro, Robert Sylverne, Paul Sturm, Scott William Benz and Patrick J. Flynn, as executives of their respective Corporations, formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the corporate Defendants that constitute the "ETMF Enterprise". Thus, Defendants Daniel B. Coleman, Carl Gilmore, Greg Hostetler, Edward W. Wedbush, Andrea Pignataro, Robert Sylverne, Paul Sturm, Scott William Benz and Patrick J. Flynn are jointly and severally liable with the Corporate Defendants for the acts and practices alleged in Plaintiffs' Complaint. In short, these nine Individual Defendants who were all Officers of their respective Corporations within the ETMF Enterprise, and who controlled it and/or participated in its activities, used the ETMF Enterprise to operate their fraudulent scheme, and acted in **bad faith** pursuant to 7 U.S.C. §25(b)(4), and violated the CEA pursuant to 7 U.S.C. § 25(b)(3). **As such, they have no privity preclusion.** The corporate Defendants and the individual Defendants of the ETMF Enterprise are collectively the "Defendants".

4. Each of these "**Defendants**" in the ETMF Enterprise was the agent, partner, servant,

employee, alter ego, aider and abettor, co-conspirator and/or joint venturer of each of the remaining Defendants herein, and were all times acting within the scope and purpose of said agency, partnership, service, conspiracy, and/or joint venture through the ETMF Enterprise, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

     5. In July/August 2013 Defendant Scott William Benz ("Benz") of the ETMF Enterprise Defendant QST informed Harry that the Defendants' Electronic Trading Facility was the best and that Harry could easily create Commodity Futures Spread Charts and electronically trade the Commodity Futures Spreads flawlessly through the commodity futures Exchanges like CME-Globex, CBOT and ICE. He assured Harry that he will not have any problem trading right inside the Spread Charts and that Defendants' electronic Trading Facility was seamlessly and tightly integrated with the Commodity Futures Exchanges. Benz's assurance or promise later turned out to be a blatant lie and deceit, because the ETMF Enterprise Defendants' Electronic Trading Facility did not match Benz's promise or assurance. In fact, Benz's Promise and the assurances of the Software Engineers of the ETMF Enterprise Defendant QST, to Harry, turned out to be a total fraud.

     6. Furthermore, in September/October 2013, Defendant Patrick Joseph Flynn ("Flynn") of ETMF Enterprise Defendant MST, also assured Harry, before opening the Harry-Draper Trading Account through the **Clearing** FCM-Defendant KCG on November 6, 2013, that Defendants' Electronic Trading Facility was tightly integrated and seamlessly connected to the Commodity Futures Exchanges, and that Harry would have no problems trading electronically. Defendants Benz and Flynn knowingly and wilfully made these promises and assurances to deceive to induce and keep, and deceived and induced Harry and Draper to move their Profitable Commodity Futures Trading Account from OEC/Daniels Trading (former Broker) to ETMF Enterprise Defendant KCG, and deceptively kept Plaintiffs as Defendants' Futures Customers. Harry and Draper justifiably relied on the representations of both Defendants Benz and Flynn since they (Benz and Flynn) had superior knowledge of their Electronic Trading Facility. But for the wilful, malicious and Fraudulent Concealment, and Fraudulent Misrepresentations of Defendants Benz and Flynn to Fraudulently Deceive and Induce Draper and Harry, Plaintiffs would never have moved their profitable Commodity Futures Trading Account from OEC/Daniels Trading to Defendants, for Defendants to defraud Plaintiffs. In

other words, Plaintiffs would have continued trading at OEC/Daniels Trading, and would have made

a profit of at least **$208,278.86** instead of **$36,314.80** as of November 30, 2013, as shown in Table 4

below. With this additional profit of **$208,278.86** added to the original Good Faith Deposit of

**$275,000**, making a total of **$483,278.86**, Plaintiff Harry would have turned this amount into tens of

millions of Dollars, with his proprietary and robust Commodity Futures Spread Trading System, in

the six years (July 2013 to July 2019) Defendants have wasted Plaintiffs' time, energy and financial

resources.

**Damage Loss From Fraudulent Deceits, Fraudulent Concealment and Fraudulent
Misrepresentations by Benz of QST, from August 12, 2013 to November 14, 2013**

| Table 4 |
|---|
| Comparing Actual and Expected Profits for the first 5 months of trading at OEC/Daniels Trading (Previous Broker) had QST not distracted Plaintiff Harry by its Fraudulent Deceits, Fraudulent Concealment and Fraudulent Misrepresentations about its QST Platform, especially during the QST-Demo Testing Period. |

| Actual Monthly Profits at OEC/Daniels Trading, from July 2013 to November 2013 Due to the Fraud of CVS/QST | | Expected Monthly Profits at OEC/Daniels Trading, from July 2013 to November 2013 Without the Fraud of CVS/QST | |
|---|---|---|---|
| **Month** | **Profit/(Loss)** | **Month** | **Profit/(Loss)** |
| July | $33,000.00 | July | $33,000.00 |
| August | $39,500.00 | August | $39,500.00 |
| September | $9,425.00 | September | $48,000.00 |
| October | -$53,375.00 | October | $60,000.00 |
| November | $11,250.00 | November | $72,000.00 |
| **Semi-Total** | **$39,800.00** | **Semi-Total** | **$219,500.00** |
| Commissions/Fees | -$3,485.20 | Commissions/Fees | -$19,221.14 |
| **Total** | **$36,314.80** | **Total** | **$208,278.86** |

7. Besides, in violation of NFA Rule 2-26 and 17 CFR § 1.55, ETMF Enterprise Defendants

MST and its President, Flynn, and KCG and its officers and employees including Daniel B. Coleman

("Coleman"), the CEO, Carl Gilmore ("Gilmore"), Head of KCG Futures (the Futures Division of

KCG), and Greg Hostetler ("Hostetler"), Chief Compliance Officer of KCG Futures, knowingly and

willfully concealed from Harry and Draper, the Financial Malfeasances of Clearing FCM Defendant

KCG, especially its near bankruptcy on August 1, 2012, the numerous litigations against KCG, and

several of KCG's Unlawful Conducts that violated Regulations, and opened Draper's and Harry's

Account on November 6, 2013. Had Flynn, Coleman, Gilmore and Hostetler not breached their Legal

Duty to Disclose (Fraudulent Concealment) to Plaintiffs Harry and Draper, the precarious financial situation of KCG and its numerous unlawful Acts, as required by NFA Rule 2-26 and 17 CFR § 1.55, Harry and Draper would  never have opened their Trading Account with Clearing FCM-Defendant KCG, and hence, would not have suffered the subsequent financial losses, as shown in table 2 below.

| Table 2 | | | |
|---|---|---|---|
| **Comparing Profits for the first 5 months of trading at OEC/Daniels Trading (Previous Brokers) and ETMF Enterprise Defendants** | | | |
| **Monthly Profits at OEC/Daniels Trading Platform, from July 2013 to November 2013** | | **Monthly Profits at ETMF Enterprise Defendants' Platform, from November 2013 to March 2014** | |
| **Month** | **Profit/(Loss)** | **Month** | **Profit/(Loss)** |
| July | $33,000.00 | November 2013 | $4,498.70 |
| August | $39,500.00 | December 2013 | -$12,050.90 |
| September | $9,425.00 | January 2014 | -$27,724.06 |
| October | -$53,375.00 | February 2014 | -$131,825.00 |
| November | $11,250.00 | March 2014 | -$46,340.55 |
| **Semi-Total** | **$39,800.00** | **Semi-Total** | **-$213,441.81** |
| Commissions/Fees | -$3,485.20 | Commissions/Fees | -$4,060.00 |
| **Total** | **$36,314.80** | **Total** | **-$217,501.81** |

8. Overall, the ETMF Enterprise Defendants defrauded Plaintiffs Draper and Harry to the tune of about **$125,012,445.73**, as at **June 30, 2019**, in Direct Damage Losses, Lost Profits, and Lost Opportunities pursuant to California Civil Code ("CCC") §§ 1709, 1710, 3294, and 3333, as shown partially in the attached Exhibit T15(a). Draper and Harry are seeking their original **$275,000 ($256,842.60 for Draper and $18,157.40 for Harry)** Good Faith Deposit openly stolen from them (Plaintiffs) by the ETMF Enterprise Defendants, Harry's **$6,078.60** total monthly trading software fee for 17 months stolen from him by the same ETMF Enterprise Defendants, and the actual **$287,462.50** Direct Damage Loss (see table 3 on Page 69 below) by the unlawful acts of the Defendants, during the relevant period. The sum of **$275,000** + **$6,078.60** + **$287,462.50** + **$208,278.86** = **$764,357.46** is the total Direct Damage Loss, from November 15, 2013 to April 28, 2015, when Harry closed out all Plaintiffs' open trade positions, due to Defendants' immense Fraud. Adding the Lost Profits or Consequential Damages of  **$124.248 Million** as at June 30, 2019, pursuant to CCC §§1709, 1710, 3294, and 3333, brings the total Damage Loss to more than **$125 Million** all the ETMF Enterprise

Defendants jointly and severally owe Plaintiffs Draper and Harry for their unlawful acts. RICO Violation, Elder Financial Abuse and Punitive Damages Costs which are based on the Base Amount of **$125,012,445.73**, will also be included during the time of discovery. Such explicit details are not needed at this pre-discovery stage of the trial. **Ultimately, the Jury will decide the Final Total Damage Cost, and not this Court or Plaintiffs or Defendants.** This is a Jury Trial.

# JURISDICTION

**A. Subject Matter Jurisdiction**

9. This action arises under the laws of the United States, and in particular, the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (the "CEA"), and Racketeer Influenced and Corrupt Organization ("RICO") Act (18 U.S.C. §1962 (C) - (D)). Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-1, 7 U.S.C. §7a-2, 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §1962 (C) - (D), and especially 7 **U.S.C. § 25(c).**

10. This Court also has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367(a), because these claims are so related to the Federal claims in this action that they form part of the same case or controversy.

**B. Constitutional Standing**

11. Both Plaintiffs Draper and Harry have Constitutional Standing. Although Draper deposited the initial **$275,000** Good Faith Deposit in the Harry-Draper Trading Account under Draper's name, Draper actually contributed **$256,842.60** and Harry contributed **$18,157.40** of this Good Faith Deposit. Furthermore, Harry contributed **$6,078.60** trading software fee for the 17 months of trading. These Financial Contributions of both Draper and Harry that were openly stolen by the ETMF Enterprise Defendants are "concrete, particularized, and actual; fairly traceable to the challenged action of Defendants; and redressable by a favorable ruling from this Court. As such, both Draper and Harry met the Supreme Court Requirement for Constitutional Standing under Article III, Section 2 of the United States Constitution, and also satisfied the heightened Pleading of FRCP 9(b), although not necessary. Besides being the Joint co-venturer of Draper in their California joint venture for Trading Commodity Futures Spreads and hence a Co-owner of their Commodity Futures Trading Account,

Harry was the sole Trader of the Account who placed the electronic buy and sell orders of the Commodity Futures for their Trading Account, and lost money (at least **$18,157.40** + **$6,078.60** or **$24,236.00**) as shown above, due to Defendants' Immense FRAUD. Hence, pursuant to 7 **U.S.C. § 25(a)** and specifically 7 **U.S.C. § 25(a)(1)(C)(ii)**, Harry as a Co-owner and Sole Trader of the trading account who also lost money, has private right of action, and thus, standing to sue the 14 Defendant-Fraudsters in any Court of his choice including this Court. The Seventh Circuit has held that CEA Section 22 or 7 U.S. Code § 25 by its terms "creates the exclusive remedies available to those injured by violations of the CEA, and makes those remedies available only to persons injured in the course of trading on a contract market. It therefore forecloses all other remedies, including any on behalf of non-traders." *American Agric. Movement v. Board of Trade*, 977 F.2d 1147, 1153 (7th Cir. 1992. Thus, Harry, the Co-owner of the Harry-Draper Commodity Futures Joint Venture Trading Account, and the sole Trader of the Account, has Constitutional Standing to sue the 14 Defendant-Fraudsters in this Court.

# VENUE

12. Venue is proper pursuant to Judicial Code, 28 U.S.C. § 1391(a) and 7 U.S.C. § 25(c), because the events giving rise to the claims asserted herein occurred in this judicial district.

# INTRADISCTRICT ASSIGNMENT

13. This Lawsuit should be assigned to the San Francisco/Oakland Division of this Court because the Account Opening Agreement was signed in Fremont, Alameda County, California, and the Events giving rise to the Claims asserted in this Complaint occurred in this Judicial District.

# PARTIES

## A. PLAINTIFF

14. **Plaintiff Bright Harry** who is Draper's Partner in their HDTP California Joint Venture for trading Commodity Futures Spreads, was the Executor of the contract between Draper and the FCM-Defendants, KCG and later Wedbush, suffered staggering financial losses including **$18,157.40**, his portion of the **$275,000** Initial Good Faith Deposit, and **$6,078.60** trading software usage fee for the 17 months of trading. At all times herein mentioned, Harry is a natural person resident in Fremont, located in Alameda County in the State of California. Harry is the Plaintiff who actually traded the

Commodity Futures Spreads in Account #TSMPF148, belonging to Harry and Draper, but under Draper's name. Harry placed the buy and sell electronic trade orders for futures contracts at CME, CBOT and ICE during the relevant period, through Defendants, and Plaintiffs Draper and Harry were damaged by Defendants' fraud and other unlawful Acts that violated Federal Laws, the Exchange Act, California Laws and NFA Rules. Harry is a Mechanical Design Engineer by Profession and ran his own Engineering Companies for more than a decade, and specializes in Commodity Futures Spread Trading as a sideline, and for the fun and challenge.

15. **Plaintiff Ronald S. Draper** is Plaintiff Harry's Commodity Futures Trading Joint Venture Partner and a resident of Newark, California. Draper was a passive investor who was not involved in any aspect of the actual trading except his contributing **$256,842.60** towards the Initial Trading Good Faith Deposit of **$275,000**. In other words, Draper's only responsibility to the Joint Venture was his provision of the bulk of the Initial Good Faith Deposit, **$256,842.60**, while totally depending on Harry's technical and trading expertise, knowledge, technology, effort, and management skills in trading the Commodity Futures Spreads for their Joint Venture, in their quest to make profits to share, 50/50. In short, Draper depended 100% on Harry's efforts, expertise, knowledge and management skills in their California Commodity Futures Spread Trading Joint Venture, with the ultimate goal of making profits to share equally.

**B. DEFENDANTS**

16. Through Fraudulent Concealment of their dysfunctional Electronic Trading Facility to Plaintiffs, and Fraudulent representation to Harry and Draper that their (Defendants') Electronic Trading Facility was fully functional, well-integrated and seamlessly connected to the commodity futures exchanges, to deceive and induce Harry and Draper, Defendants fraudulently deceived and induced Harry and Draper to move their profitable Commodity Futures Trading Account from their former broker, OEC/Daniels Trading to Defendants on November 6, 2013. Defendants' fraudulent concealment, fraudulent misrepresentations, fraudulent deceits and fraudulent inducement have financially damaged Plaintiffs to the tune of $125 million, as at June 30, 2019, exclusive of Damage Losses from Defendants' RICO Violations and Elder Financial Abuse.

17. Defendant **KCG Americas LLC ("KCG")** -- now, and at all times herein mentioned, has

been a corporation or business entity duly organized and existing under and by virtue of the State of New Jersey. It has been registered with the Commodity Futures Trading Commission as a broker-dealer since 2009. It is a subsidiary of Knight Capital Holdings LLC. It had a Futures Division called KCG Futures until November 30, 2014 when it sold it to Wedbush Securities, Inc., and KCG Futures became Wedbush Futures, from December 1, 2014. KCG is a Clearing FCM.

18. Defendant **Daniel B. Coleman D ("Coleman")** is the Chief Executive Officer of KCG Americas LLC and previously had the NFA ID Number 0296692, approved as Principal on 01/04/2000 and withdrawn on 03/31/2010. He is a controlling person of KCG Americas LLC, a registered entity with NFA and CFTC. As CEO of KCG Americas LLC, he holds and exercises direct or indirect control over KCG, and was instrumental in the sale of KCG Futures to Wedbush Securities Inc. on November 30, 2014. Also as CEO, one of his core duties is to ensure that both KCG Americas LLC and KCG Futures complied with all the relevant laws and Statutes, particularly those of the CEA and NFA.

19. Defendant **Carl W. Gilmore ("Gilmore")** resides in Oak Park, Illinois. Gilmore was the Head of KCG Futures, the Futures Division of KCG Americas LLC from February 2013 to November 30, 2014, and Head of Wedbush Futures, a division of Wedbush Securities, Inc from December 1, 2014 to December 15, 2015. His NFA ID # is 0249249, approved on 5/31/2012 as Principal for KCG Americas LLC, withdrawn on 12/1/2014, approved as Principal for Wedbush Securities, Inc. on 12/1/2014 and withdrawn on 12/15/2015. He was responsible for all aspects of managing and operating KCG Futures and later Wedbush Futures. He was also a Director and controlling person at both KCG and later Wedbush.

20. Defendant **Greg Hostetler ("Hostetler")** resides in Madison, Wisconsin. Hostetler was the Director of Compliance at KCG Futures, a Division of KCG Americas LLC, from about 2012 to November 30, 2014. From December 1, 2014, he was the Chief Compliance Officer for Wedbush Futures, a Division of Wedbush Securities, Inc. His NFA ID Number is 0312238, approved on 5/30/2012 as Principal for KCG Americas LLC, and withdrawn on 12/1/2014. Greg Hostetler was responsible for all the Compliance issues at both KCG Futures and the later Wedbush Futures.

21. Defendant **Main Street Trading, Inc. ("MST")**, now, and at all times herein mentioned,

has been a corporation or business entity duly organized and existing under and by virtue of the State of California. Main Street Trading, Inc. (MST") was the Introducing Broker to KCG Americas LLC until December 1, 2014, when KCG Futures, the Futures Division of KCG Americas LLC was sold to Wedbush Securities, Inc., and became Wedbush Futures, the Futures Division of Wedbush Securities, Inc. Main Street Trading then became the Introducing Broker of Wedbush Securities, Inc, and still is. MST was an Agent of KCG and is an Agent of Wedbush.

22. At all times herein mentioned, Defendant **Patrick Joseph Flynn ("Flynn")** is a natural person resident in Corona, located in Orange County in the State of California. Flynn has been the President and is still the President of Main Street Trading, Inc. As President of MST, he was an Agent of KCG and is currently an Agent of Wedbush. His NFA ID is 0285573. As President of MST, he is a controlling person and was responsible for deceiving and inducing Plaintiffs to move their successful Commodity Futures Trading Account from their previous Broker, OEC-Daniels Trading to Defendants on November 6, 2013.

23. Defendant **Wedbush Securities, Inc. ("Wedbush")** is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of California. Defendant Wedbush Securities Inc., the parent company of Wedbush Futures, bought KCG Futures from KCG Americas LLC on December 1, 2014, and converted KCG Futures into Wedbush Futures, its Futures Division. Wedbush Futures has been a corporation or business entity duly organized and existing under and by virtue of the State of Illinois. Wedbush is a Clearing Futures Commission Merchant ("FCM").

24. Defendant **Edward W. Wedbush ("E. W. Wedbush")** resides in Los Angeles, California. E. W. Wedbush is the Founder of Wedbush Securities Inc. and serves as its Chief Executive Officer and President. His NFA ID Number is 0086860, approved as Principal since 04/20/2009. As CEO of Wedbush Securities, Inc, he held and exercised direct or indirect control over Wedbush Securities, Inc., and was instrumental in the purchase of KCG Futures, which then became Wedbush Futures. He was also responsible for overseeing and supervising the ETMF Enterprise Defendants' Electronic Trading Facility, since Wedbush was a Clearing FCM.

25. Defendant **Computer Voice Systems, Inc. ("QST")** --- now, and at all times herein men-

tioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of Illinois. It provided the QST Platform, the Front-end of the ETMF Enterprise Defendants' Electronic Trading Facility. This front-end owned by Computer Voice Systems, Inc is the gateway to Defendant's Electronic Commodity Futures Trading.

26. Defendant **Paul Sturm ("Sturm")** is the Chief Executive Officer of QST and its founder. He is a controlling person of QST, a very critical component of the ETMF Enterprise during the relevant Period. As CEO of QST, he holds and exercises direct or indirect control over QST. Also as CEO, one of his core duties is the overall supervision of the QST Platform to ensure that it is fully functional and always connected to the Commodity Futures Exchanges since it is the Gateway of the ETMF Enterprise Defendants' Electronic Trading Facility.

27. Defendant **Scott Benz ("Benz")** is the Vice President of QST and has considerable inf-luence and supervisory role at QST. He is the main contact point between QST Customers and QST Officers and Employees. He was the one that informed Plaintiff Harry about the seamless intercon-nectivity of the QST Front-end Platform to the Commodity Exchanges that convinced Plaintiffs to adopt the QST Platform, and to eventually choose MST and Flynn, as Plaintiffs' Introducing Broker. He deceived and induced Plaintiffs to move their Account to Defendants.

28. Defendant **ION Trading, Inc. ("ION")** is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of Illinois. It is a very important component of the ETMF Enterprise, and provided the Interface and Backend of the Defendants' Electronic Trading Facility. ION provided the RANorder Application Programming Interface ("API") that connected the QST Front-end and ION Backend to the Commo-dity Futures Exchanges like CME/Globex, CBOT and ICE. The RANorder API and Backend are owned by ION Trading, Inc.

29. Defendant **Andrea Pignataro ("Pignataro")** is the Global Chief Executive Officer of ION, which has operations in many Countries of the World including the United States, where ION has locations in many States including Illinois. He is a controlling person of ION Globally and in the United States. As Global CEO of ION he holds and exercises direct or indirect control over ION. Also as Global CEO, he has the overall supervisory role of ensuring the continuous functionality and

constant interconnectivity of his Software Platforms that connect other Trading Platforms with the Exchange Platforms. He also has the overall responsibility of ensuring that ION has adequate computing capacity and redundancies to mitigate emergencies and operational failures of his Software Platforms, critical to the electronic order flow.

30. Defendant **Robert Sylverne ("Sylverne")** was the Chief Executive Officer of ION in the United States during the relevant period and he is located in Chicago, Illinois. He is a controlling person of ION in the United States. As CEO of ION-USA he held and exercised direct or indirect control over ION in the United States. Also as CEO, he had overall supervisory role of ensuring the continuous functionality and constant interconnectivity of ION Software Platforms, especially the RANorder Application Programming Interface, (API) and Backend that connect other Trading Platforms like QST with the Exchange Platforms. He also had the overall responsibility to ensure that ION had adequate computing capacity and redundancies to mitigate emergencies and operational failures of ION's Platforms, critical to the electronic order flow.

**C. OTHER PARTIES OF INTEREST**

31. **NFA** is a self-regulatory organization for the futures industry. As such, NFA develops trade practices, oversees and enforces compliance of NFA rules, and serves as the registration authority for the Futures Industry. Membership is mandatory and the Clearing FCM-Defendants, KCG and Wedbush are registered Entities and are bound by the rules of the Agency. MST, Flynn, E. W. Wedbush, Gilmore and Hostetler were registered Members of NFA during the relevant Period, and are also duty-bound to comply with the Rules of the Agency.

# I. BACKGROUND

### A. Plaintiffs Harry-Draper Trading Partnership ("HDTP") California Joint Venture

32. Bright Harry ("Harry") and Ronald S. Draper ("Draper") orally agreed to form a California Joint Venture per California Corp. Code § 16101(9), about August 2009, to trade Commodity Futures Spreads but the Global Economic Recession which started in 2007/2008, stalled their plan until around May 2013, when they finally opened a California Joint Venture commodity Futures Trading Account at OEC/Daniels Trading, under Draper's name only. Owing to difficulties with the Front-end Platform (not the Back-end Platform or Electronic Communications Network) of the OEC-

Daniels Trading Electronic Trading Facility, Harry and Draper sought an Electronic Trading Facility with a better Front-end Platform, and subsequently found Defendant Computer Voice Systems, Inc. ("QST"), and then contacted Scott William Benz ("Benz"), VP of QST around July/August 2013.

33. The Front-end QST Platform had exactly what Plaintiffs were looking for --- an easy to use Platform for creating exchange-traded Commodity Futures Spreads and their accompanying Exchange-Traded Commodity Futures Spread Charts as shown in Figure 2 below, created with the Front-end QST Platform. Figure 1 below is an Arithmetic Commodity Futures Spread Chart created with OEC/Daniels Trading Front-end Platform. Plaintiffs' inability to create the Exchange-Traded Commodity Futures Spreads and Exchange-Traded Commodity Futures Spread Charts with the OEC/Daniels Trading Front-end Platform was the only reason Plaintiffs sought another Electronic Trading Facility with a better Front-end, and contacted Defendant Benz of QST.

### B. Arithmetic and Exchange-Traded Commodity Futures Spreads

The following charts below distinguish **Arithmetic Spreads from Exchange-Traded Spreads**.

34. Figure 1 below created with the OEC/Trading Platform, is an Arithmetic Spread of December 2013 Copper against March 2014 Copper. This means first buying a December 2013 Copper futures contract and then selling a March 2014 Copper futures contract to create the Arithmetic Spread. Besides this Arithmetic Futures Spread not having a tradable pattern of lows and highs or when and where to enter the trade or exit the trade, legging in each contract separately is a very risky way to trade Commodity Futures Spread. In other words, when you leg-in a contract, your risks are extremely high and by the time you leg in the second contract to create a Spread, the price-gap or Spread would have widened too much to your disadvantage. All these risks and defects are greatly reduced or eliminated in the Exchange-Traded Spread, Figure 2.

35. Figure 2 below, created with Defendants' Front-end QST Platform, is the Exchange-traded Spread Chart of the same December 2013 Copper against March 2014 Copper, involving the **SIMULTANEOUS** buying of a December 2013 Copper Futures Contract and selling a March 2014 Copper futures contract **AT THE SAME TIME**. You do not first leg-in one contract and then leg-in the second contract to create the Spread. You enter the trade as a Spread and exit as a Spread. Furthermore, the Figure 2 Exchange-Traded Futures Spread has a tradable pattern of lows and highs.



**Figure 1**



**Figure 2**

This means a Trader can buy low and sell high or sell high and later buy back low.

36. It is thus very obvious that any Trader using OEC/Daniels Trading Arithmetic futures Spread in Figure 1 has no chance against a Trader using Defendants' Exchange-Traded Futures Spread in Figure 2. The Arithmetic Spread Trader will always lose to the Exchange-Spread Trader because the Arithmetic Spread Trader is trading blind. This is the core reason HDTP moved their Commodity Futures Trading Account from OEC/Daniels Trading to Defendants.

### C. Plaintiffs' Commodity Futures Trading Business Activities

37. Plaintiff Harry was the sole Trader of the HDTP Futures Trading Account during the relevant period. All Harry does when the right trading signal appears on his Computer Screen, based on his trading strategy, is to simply click the "blue buy-button" on the Depth-of-Market of the Front-end QST Platform on his Computer Screen, to buy the Commodity Futures Spread Contract or just click the "red sell-button" to sell the contract, using his Computer Mouse. It's as simple as that, click "blue buy-button" to buy and click "red sell-button' to sell electronically.

### D. Defendants' Business Activities

### (i) Defendants' Electronic Trading Facility

38. The Defendants' Electronic Trading Facility consists of the QST Front-end Platform connected to ION's RANorder Application Programming Interface (API) and Back-end, which are in turn connected to the Electronic Marching Engine of the Commodity Futures Exchanges like CME-Globex, CBOT and ICE. Electronic Commodity Futures Traders like Plaintiffs only deal with the Front-end. All they do is click the "buy-button" to buy or the "sell-button" to sell using the Front-end. That's it. The Interface and Backend are not the domain of the electronic commodity Futures Traders. That's the domain and responsibility of Defendants, especially the Clearing FCM-Defendants, KCG and Wedbush. There is no room for error in this business of futures Trading and hence, the Electronic Trading Facility must be tightly integrated and seamlessly connected to the Commodity Futures Exchanges at all times, while being tested constantly for functionality and integrity.

39. Plaintiffs had no problems with the backend Platform of their previous Broker, OEC-Daniels Trading because once Harry clicked the "buy-button" to buy or the "sell-button" to sell, his Electronic Order was transmitted to the Futures Exchange instantly or in milliseconds. The Backend

Electronic Communication Network (ECN) is akin to a Telecommunication Network that transmits a speaker's voice instantly, irrespective of the telephone handset. For example, a Grandson in San Francisco calling his Grandmother in London confidently expects his voice signal to be transmitted instantly by the Telecommunication Network for his Grandmother to hear him and talk with him. Only in extremely rare occasions does the voice signal transmission fail. Similarly, when a Future's Trader like Plaintiff Harry clicks his electronic buy or sell button he expects the instant transmission of his electronic order data signal from his computer to the Futures Exchange, like the voice signal from the Grandson to the Grandmother. The underlying technology is the same for the Telephone Telecommunication Network and the Electronic Trading Communication Network except that the first transmits voice signal and the latter electronic order data signal. Plaintiffs did not have any electronic order transmission issues with their former Broker, and hence did not expect any from Defendants. The only problem Plaintiffs had with OEC/Daniels Trading was their Front-end Platform that could not create Exchange-Traded Spreads and Exchange-Traded Spread Charts as explicitly described above. In short, the Front-end of the OEC/Daniels Trading Electronic Trading Facility did not have the capability for creating exchange-traded Futures Spread Charts to trade exchange-traded Futures Spreads, which the ETMF Enterprise Defendants' Front-end QST Platform had.

40. It was this Front-end QST Demo-Platform (DEMO) Defendants deployed to deceive and induce, and deceived and induced Plaintiffs to move their profitable Commodity Futures Trading Account from OEC/Daniels Trading to Clearing FCM-Defendant KCG on November 6, 2013.The alluring ease and simplicity of creating exchange-traded Spreads and exchange-traded Spread Charts on the DEMO, and the fast and flawless execution through the Virtual Futures Exchanges were what finally enticed Plaintiffs to move their Trading Account to Defendants. It was only when Harry went live on November 15, 2013 that he realized that Defendants' electronic trading Facility was defective and unable to transmit his electronic trade orders to the Futures Exchanges. Beautiful Spread Charts look great but the essence of electronic commodity futures trading is the instant transmission of Commodity Futures Trader's like Plaintiffs' electronic buy and sell trade orders to the Futures Exchanges for immediate clearing or filling of the electronic trade order. Speed of execution is of essence or paramount importance in this Futures Business.

**(i) Essence of Defendants' Electronic Trading Facility**

41. Defendants' Electronic Trading Facility transmits market participant trade orders to a matching engine that aggregates the orders from across the market in each contract, then matches the orders to buy with orders to sell at the same price, generally following a "first-in, first-out" priority. Moreover, a relationship also exists between the price of an order and its execution. A price either can be "aggressive" or "passive" depending on where the price is located compared to the current "bid-ask spread" between the highest priced bid to buy and the lowest price offer (or "ask") to sell. A passive order cannot be immediately matched upon receipt by the Commodity Futures Exchange. Overall, the higher the limit price on a buy order, the more aggressive it is, and the lower the limit price on a sell order, the more aggressive it is.

42. The Defendants' Electronic Trading Facility also distributes information back to market participants like Plaintiffs, such as order matches and executions, cancellations, changes in sizes or quantities, and changes in prices. From the perspective of market participants trading on the electronic platform, only the number of orders at various price levels and the number of contracts at each price level are visible; the identity of the originating market participant for each order is not. Market participants view this data through the market data feed and incorporate trading strategies based, in part, on that information.

43. There is no room for Error or Failure in Electronic Trading Facilities or Systems. As such, besides having double, triple or even quadruple redundancies to mitigate failures, the ETMF Enterprise Defendants have a responsibility or duty to continuously carry out six types of functional tests of their commodity Futures Electronic Trading Facility, to ensure its quality, functionality and integrity. These tests are (1) unit tests, (2) functional tests, (3) systems tests, (4) regression tests, (5) system integration tests and (6) acceptance tests. Continuous testing is the only way to avoid errors and failures. See Sub-exhibit B14 of Exhibit T13 for more details.

### E. Defendants KCG and Wedbush are Clearing FCMs

44. As **Clearing** Futures Commission Merchants ("FCM")s and **registered entities** with the NFA, both KCG Americas LLC ("KCG") and Wedbush Securities, Inc ("Wedbush") are bound by the Tenets of the CEA, and NFA Rules, to provide their Trading Customers including Plaintiffs a

functional Electronic Trading Facility, to ensure the Integrity of the Futures Market, pursuant to **CEA Section 3(a) or 7 U.S.C. § 5(a) and CEA Section 3(b) or 7 U.S.C. § 5(b)**.

    E1. _FCMs' Duties to their Futures Trading Customers with Regards to Electronic Trading_

- Modern electronic futures trading requires a very sophisticated and technologically-advanced infrastructure. Not only must the Commodity Futures Trader be given access to the data contained in the Exchange's order book, a Futures Commission Merchant must also provide the equipment, software, and communication protocols for transmitting electronic orders to and receiving electronic order messages from the Exchange.

- The FCM provides the trader, the front-end trading software or platform and the backend trading infrastructure complete with servers, routing hardware, and telecom services, to route electronic trade orders to and from an Exchange. In other words, the FCM provides its Futures Traders the front-end software or platform, servers, communication hardware, and telecom services necessary for electronic trading through the Exchanges.

- Furthermore, the FCM establishes a worldwide network of Exchange gateways through which trading connectivity is made to multiple Exchanges, coupled with redundant multiple servers and a robust and redundant telecom network, for a fail-safe electronic trading facility.

- Lastly, the FCM is fully responsible for the operation, maintenance and supervision of the electronic trading infrastructure, to ensure uninterrupted and seamless trading by its trading Customers, 24/6. There is no room for system failure in Electronic Commodity Futures Trading.

- To achieve its goal of having an electronic trading Facility or Infrastructure, Clearing FCM-defendant KCG joined forces with MST, QST and ION to form the **MICK Joint Enterprise,** which operated from before November 6, 2013 to November 30, 2014, when KCG sold KCG Futures to Wedbush, and KCG Futures became Wedbush Futures.

- On December 1, 2014, **MICK Joint Enterprise** became **CWIM Joint Enterprise**, and operated from December 1, 2014 when Wedbush bought KCG Futures from KCG, turning it into Wedbush Futures, to and beyond April 28, 2015, when Plaintiffs finally closed out all their open trade positions because of the ETMF Enterprise Defendants' Immense Fraud.

*E2. 7 U.S.C. § 4 imposes Respondeat Superior Liability upon FCMs for acts proscribed by the CEA*

45. Section 4 of the CEA contains Congress's explicit statement that the FCM should be liable for all acts of its agents within the scope of their agency. Congress' decision to hold an FCM responsible for the risk of loss from acts of its agents could be attributable to a Congressional judgment that an FCM is in a better position than its customers to police the activities of the agents, or that an FCM faces less risk costs or can spread losses more effectively than customers. *See Cange v. Stotler & Co.,* 826 F.2d at 594. Under *Rosenthal & Co. v. Commodity Futures Trading Comm'n,* 802 F.2d 963 (7th Cir.1986), commodity brokerage firms cannot avoid liability for violations of the Commodity Exchange Act by their agents acting within the scope of their employment. 7 U.S.C. § 4 (imposing respondeat superior liability upon FCMs for acts proscribed by the Act).

*E3. Clearing FCMs KCG's and Wedbush's statutory obligations and responsibilities, especially in regards to Electronic Trading Facilities*

46. Again, the FCM establishes a worldwide network of Exchange gateways through which trading connectivity is made to multiple Exchanges, coupled with redundant multiple servers and a robust and redundant telecom network, for a Fail-Safe Electronic Trading Facility. With a fully functional Electronic Trading Facility, a Trader simply clicks his buy button to buy or sell button to sell a futures contract at a particular price, and the FCM's electronic trading facility instantly routs the order into the Matching Engine of the Futures Exchange for clearing.

**i. The Exchange Matching Engine**

47. The exchange matching engine is the electronic marketplace where buyers Bid for a price, and sellers Ask for a price. The Exchange will take Bid and Ask orders and match them appropriately. Orders that are not immediately matched are held in the matching engine as part of the book of open orders. They wait until a new order arrives that will match the same price. Orders may match against more than one order. For example:

Time 1: Account MP-1 submits Order #1 to sell 10 July/November 2019 Soybean Spread contracts at 75.

   o   The order does not match any buy order, and thus it stays in the open order book.

Time 2: Account MP-2 submits Order #2 to sell 10 July/November 2019 Soybean Spread

contracts at 80.

    o   The order does not match any buy order, and so it stays in the open order book.

Time 3: Account NQ-3 submits Order #3 to buy 15 July/November 2019 Soybean Spread contracts at 80.

    o   This buy order is immediately matched with the 10 July/November 2019 Soybean Spread contracts from Order #1 resulting in a partial fill of 10 at price 75.

          ▪   Order #1 is notified that it is fully filled: Sold 10 at 75.

          ▪   Order #3 is notified that it is partially filled: Bought 10 at 75.

    o   This order is also immediately matched with 5 of the contracts from Order #2 resulting in a partial fill of 5 July/November 2019 Soybean Spread contracts at price 80. This partial fill will result in Order #3 being fully filled and Order #2 remaining partially filled with 5 contracts still in the open order book.

          ▪   Order #2 is notified that it is partially filled: Sold 5 at 80.

          ▪   Order #3 is notified that it is fully filled. Bought 5 at 80.

Each exchange matching engine performs somewhat differently. The logic for how the orders are matched is determined by the exchange. The most common logic is "Price-Time" priority. This means that the best price is used to match the order and that orders that have been in the open order book have priority. This can easily be thought of as "First-In, First Out" at each price level.

## ii. The Clearinghouse Records the Trade

    48. The Clearinghouse provides centralized clearing. It operates as a proxy buyer for every seller and as a proxy seller for every buyer. As a proxy, it is able to guarantee every trade. That way, if one side of the trade fails to provide a settled trade, the Clearinghouse will ensure that the other side is not disadvantaged. Centralized clearing provides transparency and security for all market participants. Once the trade is recorded in the Clearinghouse system, it is then reported directly to the FCM's back office system. The back office is responsible for recording all trades, managing the positions for each account, and managing the money (profit, loss, funds on deposit, margin) for the trading firm or the trader. In this instance, the Clearing FCM's for Plaintiffs were KCG first and Wedbush later.

### iii. FCM Clearing System Records Trade

49. The Clearing System at the FCM can be thought of as the central account management system for each clearing account. If the FCM agrees with the trade, then it reports acceptance of the trade to the Clearinghouse for settlement. If it doesn't agree with the trade, it will report the rejection of the trade to the Clearinghouse and go through a "trade break" process. The FCM is guaranteeing the trade. All trades processed through the FCMs trading systems or brokers are guaranteed. If the trading account is unable to settle the trade for whatever reason the FCM will take the trade into its own accounts.

### iv. Clearinghouse Settles Trade

50. Once a trade is accepted by the FCM and accepted by the Clearinghouse, the Clearinghouse will complete the trade settlement process. As stated earlier, the Clearinghouse is a proxy buyer to every seller and a seller to every buyer. The Clearinghouse uses the acceptance of the trade to verify that both sides have accepted the trade. If one side doesn't, the Clearinghouse will work with the FCM to fix the trade break.

### F. The ETMF Enterprise

### Defendants' Joint Enterprise

51. The Federal Circuit held that all participants of a joint enterprise are individually accountable for steps performed by the others. Four elements are required to show a joint enterprise:
- an agreement, express or implied, among the members of the group;
- a common purpose to be carried out by the group;
- a community of pecuniary interest in that purpose, among the members; and
- an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

(i) KCG, MST, QST and ION all had agreements among themselves especially with the Clearing FCM, KCG, from at least July 2013 to November 30, 2014. (ii) Wedbush, MST, QST and ION also all had agreements among themselves especially with the Clearing FCM, Wedbush, from December 1, 2014 when KCG sold KCG Futures to Wedbush, as Wedbush Futures, to and beyond April 28, 2015, when Plaintiffs closed out all their open trading Positions due to Defend-ants' egregious Fraud. (iii) The common purpose of KCG, Wedbush, MST, QST and ION is to provide their Customers including Plaintiffs, a functional and well-integrated Electronic Trading Facility that is seamlessly

1   connected to the Futures Exchanges, for the customers to place electronic trade orders, for the

2   purchase or sale of Commodity Futures Contracts. (iv) The Pecuniary interests of KCG, Wedbush,

3   MST, QST and ION are the monthly Platform or Software Subscription Fees, and trading Commis-

4   sions they collect from their Customers including Plaintiffs, to share among themselves. (v) Each of

5   the Corporate entities has an equal right of voice in the direction of the enterprise, which gives an

6   equal right of control to perform the other steps of the method, since (1) MST, QST and ION are

7   agents of the directing or controlling participants, KCG and/or Wedbush, and (2) MST, QST and

8   ION are contractually obligated to the directing or controlling participants, KCG and/or Wedbush,

9   Thus, KCG, Wedbush, MST, QST and ION are a Joint Enterprise

> A "*joint enterprise*" rests upon an analogy to the law of partnership. It is something like a part-
> nership for a more limited period of time and a more limited purpose. It is an under-taking to
> carry out a small number of acts or objectives which are entered into by association under
> such circumstances that all have an equal voice in directing the conduct of the enterprise. The
> law then considers that each is the agent or servant of the others and that the act of any within
> the scope of the enterprise is to be charged vicariously against the rest. Prosser, Torts 4th Ed.,
> Ch. 12 § 72.

## Joint and Several Liability Pursuant To Cal. Civ. Code §§ 1659 and 1660

16      52. Cal. Civil Code § 1659 states that, "Where all the parties who unite in a promise receive

17   some benefit from the consideration, whether past or present, their promise is presumed to be joint

18   and several." Similarly, Civil Code § 1660 states, "A promise, made in the singular number, but

19   executed by several persons, is presumed to be joint and several." In this instance, KCG, Wedbush,

20   MST, QST and ION have promised to provide their Customers including Plaintiffs, a functional and

21   well-integrated Electronic Trading Facility that is seamlessly connected to the Futures Exchanges, for

22   the customers to place electronic trade orders for the purchase or sale of Commodity Futures

23   Contracts. For provision of this service by Defendants KCG, Wedbush, MST, QST and ION, they

24   (Defendants) receive monthly Platform or Software Subscription Fees, and Trading Commissions

25   from their Customers including Plaintiffs, to share among themselves. Subsequently, Defendants

26   KCG, Wedbush, MST, QST and ION are jointly and severally liable to Plaintiffs, and it has long

27   been settled that contracting parties who are severally liable, or subject to joint and several liability,

28   may be sued in the same action *or in separate actions* at the Plaintiff's option. (*Goff v. Ladd* (1911)

161 Cal. 257, 260; *Moreing v. Weber* (1906) 3 Cal.App. 14, 21-22.) The Plaintiff "does not lose the right to the several liability of a several obligor until the obligation is fully satisfied," notwithstanding that he may have obtained a judgment against other severally liable obligors. (*Melander v. Western Nat. Bank, supra,* 21 Cal.App. at p. 475.)

53. Clearing FCM Defendants KCG Americas LLC ("KCG") and Wedbush Securities, Inc. ("Wedbush") respectively formed the **MICK Joint Enterprise** and **CWIM Joint Enterprise**. These two Joint Enterprises, Defendants' RICO Enterprises, became components of the Umbrella RICO Enterprise, the **Electronic Trade Manipulation Fraud ("ETMF")** Enterprise.

### G. The Legal and Technology Challenges Posed by Electronic Trading in Commodity Futures and the U.S. Regulatory Response Thereto

54. Currently, the chasm between the extremely advanced and advancing electronic trading technologies, and the archaic and nascent laws governing them is so deep that the US Congress, Judges, the Courts and even the CFTC are scrambling to find a solution to this legal conundrum. Unfortunately, there is none at present, and the chasm has just gotten deeper, as the electronic trading Industry is catapulting to Artificial intelligence, Machine Learning and even Blockchain Technologies, leaving Congress, CFTC and the Courts behind to continue grappling with Automated Trading Systems ("ATS") and High Frequency Trading ("HFT"). This is a global phenomenon that will take decades, if not forever, to resolve. This chasm has created a goldmine for opportunistic Attorneys to throw more legal confusion into the already intractably deep legal quagmire. It is confusion galore, where even incompetent Attorneys who have no clue of the underlying electronic trading technologies, are speaking in legal tongues and getting away with it because there are few or no laws and the few nascent laws have no case laws. It's a night-mare for Defrauded Plaintiffs.

## II.   FACTUAL ALLEGATIONS

### A. THE ELECTRONIC TRADE MANIPULATION FRAUD ("ETMF") ENTERPRISE

### A1. MICK Joint Enterprise

55. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

56. The **MICK Joint Enterprise** was an association or partnership within the meaning of 18

U.S.C. § 1961(4), consisting of a network of companies and associates that shared a common purpose of earning revenues from their Trading Customers including Plaintiffs by providing them (Defendants' Customers) with an Electronic Trading Facility for Electronic Trading and for Transmission of the Customers' Electronic Trade Orders through the Commodity Futures Exchanges.

57. The **MICK Joint Enterprise** includes several companies within the group of companies that operated under the ETMF Enterprise. The network of companies and individuals within the **MICK Joint Enterprise,** carried out their scheme under the direction and control of Clearing FCM-Defendant KCG. The following are known Members of the **MICK Joint Enterprise**.

        a) Main Street Trading, Inc. ("MST"),

        b) ION Trading, Inc. ("ION"),

        c) Computer Voice Systems, Inc. ("QST"),

        d) KCG Americas LLC ("KCG"),

        e) Daniel B. Coleman, ("Coleman"),

        f) Carl Gilmore ("Gilmore"),

        g) Greg Hostetler ("Hostetler"),

        h) Patrick J. Flynn (Flynn),

        i) Andrea Pignataro ("Pignataro"),

        j) Robert Sylverne ("Sylverne"),

        k) Paul Sturm ("Sturm") and

        l) Scott William Benz (Benz").

The MICK Joint Enterprise operated from November 6, 2013 to November 30, 2014, when KCG sold KCG Futures to Wedbush, and it became Wedbush Futures.

58. The identities of other Members of the **MICK Joint Enterprise,** are unknown but are expected to be identified through the discovery process.

59. The Members of the **MICK Joint Enterprise** did not share a common ownership, nor were they all wholly owned directly or indirectly. Nevertheless, at all relevant times, the **MICK Joint Enterprise** was directed and controlled by the Individual Officer-Defendants, who approved, authorized, and/or either specifically or tacitly directed, ratified or participated in the acts of the

1  MICK Joint Enterprise.

2  **A2. CWIM Joint Enterprise**

3      60. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the

4  allegations with the same force and effect as if fully restated herein.

5      61. The **CWIM Joint Enterprise** was an association or partnership within the meaning of 18

6  U.S.C. § 1961(4), consisting of a network of companies and associates that shared a common

7  purpose of earning revenues from their Trading Customers including Plaintiffs by providing them

8  (Defendants' Customers) with an Electronic Trading Facility for Electronic Trading and  for

9  Transmission of the Customers' Electronic Trade Orders through the Commodity Futures Exchanges.

10      62. The **CWIM Joint Enterprise** includes several companies within the group of companies

11  that operated under the ETMF Enterprise. The network of companies and individuals within the

12  **CWIM Joint Enterprise,** carried out their scheme under the direction and control of Clearing FCM-

13  Defendant Wedbush. These are the known Members of the **CWIM Joint Enterprise.**

14              a) Computer Voice Systems, Inc. ("QST"),

15              b) Wedbush Securities Inc. ("Wedbush"),

16              c) ION Trading, Inc. ("ION"),

17              d) Main Street Trading, Inc. ("MST"),

18              e) Edward W. Wedbush ("E.W. Wedbush"),

19              f) Carl Gilmore ("Gilmore"),

20              g) Greg Hostetler ("Hostetler"),

21              h) Patrick J. Flynn (Flynn),

22              i) Andrea Pignataro ("Pignataro"),

23              j) Robert Sylverne ("Sylverne"),

24              k) Paul Sturm ("Sturm") and

25              l) Scott William Benz (Benz").

26  The **CWIM Joint Enterprise** operated from December 1, 2014 when Wedbush bought KCG Futures

27  from KCG, turning it into Wedbush Futures, to and beyond April 28, 2015, when Plaintiffs closed

28  out all their open trading positions because of Defendants' Immense Fraud.

63. The identities of other Members of the **CWIM Joint Enterprise,** are unknown but are expected to be identified through the discovery process.

64. The Members of the **CWIM Joint Enterprise** did not share a common ownership, nor were they all wholly owned directly or indirectly. Nevertheless, at all relevant times, the **CWIM Joint Enterprise** was directed and controlled by the Individual Officer-Defendants, who approved, authorized, and/or either specifically or tacitly directed, ratified or participated in the acts of the CWIM Joint Enterprise.

65. The **MICK Joint Enterprise** and the **CWIM Joint Enterprise** are referred to collectively, as the **ETMF Enterprise**.

*The Five Corporate Defendants are all Jointly and Severally Liable as a Joint Enterprise, the "ETMF Enterprise", through which the Nine Individual Defendants Carried Out their Misconducts to Defraud Plaintiffs Draper and Harry*

66. The ETMF Enterprise Defendants include the 5 (five) Corporate Defendants Wedbush Securities Inc. ("Wedbush"), ION Trading, Inc. ("ION"), Main Street Trading, Inc. ("MST"), Computer Voice Systems, Inc. ("QST") and KCG Americas LLC ("KCG"), and 9 (nine) Individual Defendants (Daniel B. Coleman, Carl Gilmore, Greg Hostetler, Edward W. Wedbush, Andrea Pignataro, Robert Sylverne, Paul Sturm, Scott William Benz and Patrick J. Flynn. The 5 Corporate Defendants operated as a Joint Enterprise, the Electronic Trade Manipulation Fraud ("ETMF") Enterprise, and thus, are jointly and severally liable for the misconducts alleged in Plaintiffs' Complaint.

67. Defendants Daniel B. Coleman, Carl Gilmore, Greg Hostetler, Edward W. Wedbush, Andrea Pignataro, Robert Sylverne, Paul Sturm, Scott William Benz and Patrick J. Flynn, as executives of their respective Corporations, formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the corporate Defendants that constitute the "ETMF Enterprise". Thus, Defendants Daniel B. Coleman, Carl Gilmore, Greg Hostetler, Edward W. Wedbush, Andrea Pignataro, Robert Sylverne, Paul Sturm, Scott William Benz and Patrick J. Flynn are jointly and severally liable with the Corporate Defendants for the acts and practices alleged in Plaintiffs' Complaint. In short, these nine Individual Defendants who were all Officers of their respective Corporations within the ETMF Enterprise, and who controlled it and/or participated in its activities, used the ETMF Enterprise to operate their fraudulent scheme, and acted in **bad faith**

pursuant to 7 U.S. C. §25(b)(4), and violated the CEA pursuant to 7 U.S. C. § 25(b)(3). **<u>As such,</u>** **<u>they have no privity preclusion</u>**. The corporate Defendants and the individual Defendants of the ETMF Enterprise are collectively the "Defendants".

68. Each of these "**<u>Defendants</u>**" in the ETMF Enterprise was the agent, partner, servant, employee, alter ego, aider and abettor, co-conspirator and/or joint venturer of each of the remaining Defendants herein, and were all times acting within the scope and purpose of said agency, partner-ship, service, conspiracy, and/or joint venture through the ETMF Enterprise, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

## B. DEFENDANTS' FRAUDULENT MISREPRESENTATIONS, FRAUDULENT CONCEALMENT, FRAUDULENT DECEITS AND FRAUDULENT INDUCEMENT

69. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

70. The ETMF Enterprise Defendants' Electronic Trading Facility consists of disparate Platforms, the QST Front-end Platform connected to ION's RANorder Application Programming Interface ("API") and ION's Back-end Platform, which are in turn connected to the Electronic Marching Engine of the Commodity Futures Exchanges like CME/Globex, CBOT and ICE. Electronic Commodity Futures Traders like Plaintiffs only deal with the Front-End Platform. All they do is click the "buy-button" to buy or the "sell-button" to sell using the Front-End Platform. That's it. The API, Back-end and Electronic Communications Network ("ECN") are not the domain of the Electronic Commodity Futures Traders. That's the domain and responsibility of ETMF Enterprise Defendants, especially the Clearing FCM Defendants, KCG and Wedbush.

71. Normally, it takes at least a few months to several years to integrate disparate Soft-ware Platforms like the ETMF Enterprise Defendants', and even, then these Platforms have to be tested regularly to ensure adequate functionality. As shown in Sub-exhibit B14 of Exhibit T13, there are six quality tests for software functionality, (1) Unit Testing, (2) Functional Testing, (3) System Testing, (4) Regression Testing, (5) System Integration Testing and (6) Acceptance Test-ing. These tests are the norm in the software industry. Plaintiffs Harry and Draper believed that these tests had already been performed by Defendants and are continually performed by Defend-ants to ensure continuous

functionality of their Electronic Trading Facility, backed by multiple redundancies to mitigate any Electronic Trading System Failure.

72. Moreover, CEA Section 3(b) or (7 U.S.C. § 5(b)), NFA RULE 2-26 or 17 CFR § 1.11, CEA Sec. 5b(c) or 7 U.S.C. § 7a–1(c), and CEA Sec. 5c. or 7 U.S.C. § 7a–2 impose Statutory Duties of Sufficient Risk Management, Efficient and Adequate Systems Safeguards, and unflinching Compliance with all Rules and Regulations of the CEA, on the ETMF Enterprise Defendants, especially the Clearing FCM Defendants, KCG and Wedbush,. Subsequently, Plaintiffs were quite confident and firmly believed that the ETMF Enterprise Defendants were following the rules and regulations, especially of the CEA, by ensuring that that they had a fully functional Electronic Trading Facility with multiple Redundancies to mitigate or reduce System Failures to ensure the Integrity of the Commodity Futures Market, pursuant to CEA Section 3(b). It is not only an unconscionable folly but also an extremely costly venture for any Software Vendor to introduce a dysfunctional software program or one that has not been thoroughly tested for functionality to the Public. It is financially deadly for Commodity Futures Traders including Plaintiffs. For, System Failure is not an option in Electronic Commodity Futures Trading.

73. Lastly, since Plaintiffs did not have any problems with the transmission of their Electronic trade orders at OEC/Daniels Trading (their previous Broker), Plaintiffs did not expect any transmission problems with the ETMF Enterprise Defendants either. After-all, the only reason Plaintiffs were moving their Commodity Futures Trading Account was because the ETMF Enterprise Defendants had a superior Front-end Platform for creating Exchange-Traded Spreads and Exchange-Traded Spread Charts, to trade Exchange-Traded Commodity Futures Spreads.

74. Shockingly and unfortunately, Plaintiffs encountered Electronic Order transmission problems with Defendants from day 1 of going Live, on November 15, 2013, as shown below by the Email Exchanges between Plaintiff Harry, and Defendant Benz and QST Software Engineers.

75. At about 10:00 a.m. on November 15, 2013, Harry clicked the QST-LIVE button and thus switched from the QST-DEMO to the QST-LIVE as shown in Exhibit 1 below and as Sub-exhibit 1 in the attached "Exhibit T12", entitled, **"Screen Print of order entry problems on November 15, 2013"**. Harry clicked the blue buy button to place buy orders for 20 contracts of 2014 July-

November Soybean Spread and 20 contracts of 2014 July-December Soymeal Spread.



**Exhibit 1: Screen Print of order entry problems on November 15, 2013**

As can be seen on the screenshot above, the ETMF Enterprise Defendants Trading Facility did not perform as promised by both Benz and Flynn. In other words, the ETMF Enterprise Defend-ants' electronic trading Facility was unable to route and clear Plaintiffs' Trade Orders through the Commodity Futures Exchanges on 11/15/2013, as they promised, that with the click of a button, Harry could switch from the QST-DEMO Platform to QST-LIVE Platform. Defendants failed to resolve this problem for the whole of 11/15/2013.

76. From about 5::00 P.M. on November 17, 2013 into the early Morning hours of November 18, 2013, Harry clicked the blue buy button to place the same orders as of November 15, 2013 but with no success. The ETMF Enterprise Defendants' Electronic Trading Facility was still dysfunctio-nal. As shown in Exhibit 2 below and in the attached "Exhibit T12", entitled, "**RAN Linking Confi-guration Problems of November 17, 2013**", Plaintiff Harry clicked the blue buy button to place his previous orders again at 6:41 a.m. on November 18, 2013 but Defendants' Electronic Trading Facility failed again to route his orders to the exchange. The QST Platform access problem was corrected at

about 7:20 a.m. on November 18, 2013 with a change of IP/DNS Address. Benz gave Harry the wrong IP/DNS Address.



**Exhibit 2: RAN Linking Configuration Problems of November 17, 2013**

77. Plaintiff Harry could still not trade his Commodity Futures Spreads through ETMF Enterprise Defendants' Electronic Trading Facility on November 19, 2013 and hence, he (Harry) experimented with naked contracts by placing an order for 20 naked contracts of January 2014 Soybean. This naked commodity order was successful. In other words, Defendants' Electronic Trading Facility, for the first time, successfully routed, matched and Harry's Electronic Trade Order. Plaintiff Harry closed out the positions on the same day, November 19, 2013 with a profit of $5,250.

78. On November 21, 2013, Harry placed an electronic order for 20 contracts of 2014 January/July Soybean Spread but Defendants' Electronic Trading Facility failed again, to accept the order as shown below in Exhibit 3. Thus, Harry placed the same electronic order on the QST Demo Platform just to test the QST Trading Platform. As shown on Exhibit 3 below and in the attached "Exhibit T12", entitled, " **Trading Problems for November 21, 2013**", Defendants' QST-Demo Platform itself failed for the first time. In other words, Defendants' Trading Facility again failed to

1  route and clear Plaintiff Harry's Trade Orders through the Commodity Futures Exchange from

2  11/21/2013 to 11/28/2013, as confirmed by Alina Redli, an employee of QST. Hence, Harry missed

3  the best opportune times to enter the lucrative, seasonal July/November 2014 Soybean Spread and

4  July/December 2014 Soymeal Spread, resulting in a $394,400 total loss due to Defendants' Fraudu-

5  lent Deceits, Fraudulent Concealment and Fraudulent Misrepresentations of their dysfunctional

6  Electronic Trading Facility, as shown in Sub-exhibits 5a-1, 5a-2, 5b and 5i of Exhibit T12.

---

### Trading Problems for November 21, 2013

Alina Redli
To: bharry88@yahoo.com
CC: quotes_support@computervoice.com quotesgui@computervoice.ro
Nov 21, 2013

Hello,
Our development team found the problem and they are already working to fix it.

We will make an update in the weekend that will include the fix so everything should be working fine next week.

Thank you for reporting this and sorry for any inconvenience.
--
Regards,
Alina Redli
QST Support

On 11/21/2013 9:58 AM, bharry88@yahoo.com wrote:

Placed a Spread order to sell 20 ZSF14:N14 @ 24.00 but the order was filled at (-24.00). In other words, instead of a ZSN14 buy @1253^0 and a ZSF14 sell @1279^0, ZNSF14 was bought wrongly @1303^0 and ZSF14 sold correctly @1279^0. I executed this trade as Paper trading instead of live because i was having issues with the live trading. This is really scary, having a $48,000 plus loss because of a software snaffu.

ZSF14:N14 Spread SOLD @24.00

ZSN14 Buy WRONGLY PLACED @1303^0 instead of 1253^0

ZSF14 CORRECTLY SOLD @1279^0

**Exhibit 3**

---

79. From November 15, 2013 to December 26, 2013 the disconnections of the ION Trading

RANorder Interface between the QST Platform and the Commodity Futures Exchanges were simply

mind-boggling. The number of disconnections in just two months were so stagger-ing that Plaintiff

1   Harry lost count of them. Harry was no longer certain if Defendants' Electronic Trading Facility

2   would successfully route and clear his Electronic Trade Orders, despite the promises of the QST

3   software engineers, as confirmed by Exhibit 4, entitled, **RAN Problem on December 26, 2013**",

4   below and in Exhibit T12. As succinctly detail under Operational Failure-

> **RAN Problem on December 26, 2013**
>
> At about 9:35 p.m. California time, RAN was delinked from QST, while I was attempting to execute . ZSF14 was gradually going up and I wanted to cancel my order (buy at 13.1250). Could not. Called KCG and spoke with Mark who told me that it was a QST problem. While he was looking at the problem, I rebooted the QST Software and the problem was resolved. Unfortunately, the market had gone too high for me to create the protective ZSH14 - ZSF14 Spread.

**Exhibit 4**

10   Racketeering Pattern below, these Systemic Operational Failures of the ETMF Enterprise

11   Defendants' Electronic Trading Facility continued unabated for 17 full months, when Plaintiffs

12   finally pulled the plug, by closing out all their open trade positions on April 28, 2015.

**B1. Scott Wiliam Benz ("Benz") Made False Statements and Concealed Material Facts from Plaintiffs To Induce and Induced Plaintiffs To Move Their Account to Defendants.**

15       80. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the

16   allegations with the same force and effect as if fully restated herein.

17       81. In July/August 2013 Defendant Scott William Benz ("Benz"), VP of the ETMF Enterp-

18   rise Defendant QST, informed Harry that the ETMF Enterprise Defendants' electronic trading facility

19   was the best and that Harry could easily create Commodity Futures Spread charts and electronically

20   trade the Commodity Futures Spreads flawlessly through the Commodity Futures Exchanges like

21   CME/Globex, CBOT, ICE, etc. He assured Harry that Harry would not have any problem trading

22   right inside the Charts and that their (Defendants') Electronic Trading Facility was seamlessly and

23   tightly integrated with the Commodity Futures Exchanges. To make assurance doubly sure that

24   Defendants' Electronic Trading Facility was performing as Benz claimed, Harry demanded three

25   months instead of the normal two weeks to test out Defendants' Electronic Trading Facility.

26       82. Thus, from August 12, 2013 to November 14, 2013, Benz and Software Engineers at QST

27   taught and showed Plaintiff Harry how to set up and use the Demo ETMF Enterprise Defendants'

28   Trading Platform ("DEMO"), how to place orders on the DEMO that are routed through the virtual

1    CME/Globex, ICE and CBOT Futures Exchanges. The DEMO was phenomenal in its ease and

2    simplicity of creating Exchange-traded Spreads and Spread Charts, and the speed of execution of

3    Plaintiff Harry's electronic trade orders through the virtual Exchanges was lightning fast. The Soft-

4    ware Engineers at QST and especially Benz emphatically informed Harry that the DEMO is the same

5    as the Live ETMF Enterprise Defendants' Trading Platform ("LIVE"), and that Harry could switch

6    back and forth between the DEMO and LIVE instantaneously, with the click of the mouse button.

7    Benz and the QST software engineers also informed Harry before he went live that the LIVE was

8    tightly connected to the real Futures Exchanges, just as the DEMO was tightly connected to the

9    Virtual Futures Exchanges, and that Harry's LIVE electronic trade order flow would be as seamless

10   and fast as the DEMO electronic order flow. These promises and assurances from Benz and the QST

11   Software Engineers, and the phenomenal performance of the DEMO for full three months, were what

12   convinced and induced Plaintiffs HDTP to move their Successful Commodity Futures Trading

13   Account from OEC/Daniels Trading (Plaintiffs' previous Broker) to the ETMF Enterprise

14   Defendants.

15   **B2. Patrick J. Flynn ("Flynn") Made False Statements and Concealed Material Facts From Plaintiffs To Induce and Induced Plaintiffs To move Their Account to Defendants.**

16

17       83. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the

18   allegations with the same force and effect as if fully restated herein.

19       84. In September/October 2013, ETMF Enterprise Defendant Patrick J. Flynn ("Flynn") of

20   MST, also assured Harry, before opening the Draper-Harry Trading Account at MICK Joint Enter-

21   rise Defendant KCG on November 6, 2013, that the MICK Joint Enterprise Defendants' electronic

22   trading facility was tightly integrated and seamlessly connected to the commodity futures Exchanges,

23   and that Harry would have no problems trading electronically. In short, Flynn corroborated the

24   promises and assurances of Benz and the QST Software Engineers, that the ETMF Enterprise Defen-

25   dants' Electronic Trading Facility was among the best, and tightly integrated to the Commodity

26   Futures Exchanges. Flynn's corroboration further convinced and induced Harry and Draper to move

27   their Profitable Commodity Futures Trading Account from OEC/Daniels Trading (former Broker) to

28   MICK Joint Enterprise Defendant KCG.

**B3. Flynn, Gilmore and Hostetler knowingly and intentionally failed to furnish Plaintiffs with the FCM disclosure documents before opening Plaintiffs' Futures Account**

85. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

86. On November 6, 2013, Clearing FCM-Defendant KCG Americas LLC ("KCG"), through its Head of KCG Futures, Gilmore, its Director of Compliance, Hostetler, and its Agent, Patrick Joseph Flynn, President of Main Street Trading, Inc ("MST"), the Introducing Broker, entered into a Customer Futures Agreement with Plaintiffs Harry and Draper, without KCG, Flynn, Gilmore and Hostetler providing Harry and Draper, the KCG FCM Disclosure Document. Pursuant to NFA Rule 2-26 and 17 CFR § 1.55. KCG, Flynn, Gilmore and Hostetler had a legal Duty to provide this Disclosure Document to Plaintiffs, and also inform Plaintiffs about KCG's business, operations, risk profiles, affiliates, and litigations against it, that were material to Harry's and Draper's decision to open an Account with and do business with KCG, as required by NFA Rule 2-26 and 17 CFR § 1.55. To perpetuate their Fraudulent Concealment and Fraudulent Misrepresentations to deceive to induce Plaintiffs to move their Commodity Futures Trading Account to Defendants, the ETMF Enterprise Defendants KCG, Gilmore, Hostetler and Flynn intentionally refused to provide HDTP with the KCG FCM Disclosure Document, in violation of NFA Rule 2-26 and 17 CFR § 1.55, and opened a Futures Trading Account for Plaintiffs on November 6, 2013.

**B4. Flynn, Gilmore and Hostetler knowingly and intentionally failed to furnish Plaintiffs with the FCM disclosure documents before moving Plaintiffs' Futures Account to Wedbush**

87. On November 30, 2014, Clearing FCM-Defendant KCG Americas LLC ("KCG"), through its Head of KCG Futures, Gilmore, its Director of Compliance, Hostetler, and its Agent, Patrick Joseph Flynn, President of Main Street Trading, Inc ("MST"), the Introducing Broker, transferred Plaintiffs Harry's and Draper's Futures Trading Account from KCG Futures to Wedbush Futures, without KCG, Flynn, Gilmore and Hostetler providing Harry and Draper, the KCG FCM Disclosure Document. Furthermore, on December 1, 2014, Clearing FCM-Defendant Wedbush Securities, Inc. ("Wedbush"), through its Head of Wedbush Futures, Gilmore, its Director of Compliance, Hostetler, and its Agent, Patrick Joseph Flynn, President of Main Street Trading, Inc ("MST"), the Introducing Broker, transferred Plaintiffs Harry's and Draper's Futures Trading Account from KCG Futures to

1   Wedbush Futures, without KCG, Flynn, Gilmore and Hostetler providing Harry and Draper, the

2   Wedbush FCM Disclosure Document. Pursuant to NFA Rule 2-26 and 17 CFR § 1.55. KCG,

3   Wedbush, Flynn, Gilmore and Hostetler had a legal Duty to provide the Webush FCM Disclosure

4   Document to Plaintiffs, and also inform Plaintiffs about Wedbush's business, operations, risk

5   profiles, affiliates, and litigations against it, that were material to Harry's and Draper's decision to

6   allow the transfer of their Futures Trading Account from KCG to Wedbush.

7         88. The Wedbush FCM Disclosure was material for Draper and Harry to decide if they

8   wanted to do business with Wedbush The Document would have alerted Draper and Harry to the

9   fraudulent Misconducts of Wedbush in the Securities and Futures businesses and the numerous

10  lawsuits against Wedbush as listed below:

11  <u>**WedBush**</u>
   a)   SEC vs. Wedbush, **[Administrative Proceeding, File No. 3-15913].**

12   b)   FINRA Charges Wedbush Securities for Systemic Market Access Violations, Anti-Money
        Laundering and Supervisory Deficiencies, FINRA, August 18, 2014.

13   c)   SEC Sues Wedbush Securities and Dark Pool Operator Liquidnet Over Regulatory
        Violations, Institutional Investor Securities Blog, June 6, 2014

14   d)   Wedbush ordered to pay $3.5M for 'morally reprehensible failure', Investment News, July
15        11, 2011.

16   e)   **Wedbush to Pay Trusts, Family Members Over $813,000**
        A Financial Industry Regulatory Authority Panel says that Wedbush securities and

17        investment advisor Kevin Thomas Scarpelli must jointly and severally pay several investors
        over $813,000 to resolve allegations of professional negligence and failure to supervise

18        (November 18, 2015).
   f)   Wedbush has been named in at least 53 regulatory events and 52 arbitrations. Failure to
19        supervise was a common complaint.

20         89. Had Harry and Draper known of these facts about Clearing FCM Wedbush, Plaintiffs

21  would never have allowed the transfer of their Commodity Futures Trading Account from KCG

22  Futures to Wedbush Futures. By Harry and Draper stopping this transfer, the above-mentioned

23  Defendants would not have had the opportunity to further defraud Plaintiffs resulting in the huge

24  financial loss of $125 million, to Plaintiffs, as of June 30, 2019.

25         **C. <u>DEFENDANTS' FRAUDULENT MISREPRESENTATIONS THROUGH FALSE</u>**
        **<u>ADVERTISEMENTS ON THEIR RESPECTIVE WEBSITES</u>**
26

27         90. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the

28  allegations with the same force and effect as if fully restated herein.

### C1. Defendant Wedbush's Website Advertisements

91. Defendant Wedbush through its websites, has disseminated or has caused to be disseminated advertisements and promotional materials about its functions, capabilities, capacities and Trading Facilities as a Clearing FCM and Market Maker. These advertisements and promotions contain the following statements:

### (i) Wedbush Services

## CLEARING AND EXECUTION

**Relentless Service**
Our unparalleled **dedication** to your financial success. A relationship built on **trust**, supported by a firm built on **experience**, **stability**, and **innovation**

**Brokerage & Advisor**
We offer a comprehensive suite of customizable technology solutions. These innovations, combined with our extensive industry experience and access to third party resources, allow you to spend less time worrying about operations and more time focusing on your client relationships. We welcome the opportunity to showcase our services and learn how we can be of assistance.

**Capabilities**
As members of the Depository Trust & Clearing Corporation (DTCC), National Securities Clearing Corporation (NSCC), Options Clearing Corporation (OCC), Euroclear, and all major exchanges including the New York Stock Exchange (NYSE), we are well-positioned to execute on your needs.

**Technology**
All of our technology solutions are designed with productivity and efficiency in mind. We focus on in-house development to ensure that we offer the highest quality and most dynamic products in the marketplace. Wedbush products, Broker Insight™ and ClientLink™, provide exceptional account management tools that are in demand by reps and clients alike.

**Trading & Market Automation**
We understand your need for efficiency in operations, consistency in performance, and transparency in both process and economics. Our services and innovative tools were built on these concepts to provide a complete solution that is unrivaled in the industry.

**Sponsored & Direct Market Access**
Wedbush's broad market access, expertise, and integration with leading order management systems make us the best choice for your sponsored or direct access needs. We are consistently a top volume provider to all major exchanges, which enables us to help reduce execution costs and increase rebate income.

**Technology**
Our in-house technology development team ensures that we stay ahead of the curve and highly responsive to our clients' needs. We build custom solutions to optimize our trade reconciliation and settlement process, compliance reporting, risk management, and third party integration.

**Risk Management**

To carefully monitor trading exposure, we utilize industry-leading real-time risk management controls. Our experienced team works closely with clients to provide best-practice consulting and insight to regulatory concerns.

**Direct Market Access**

Wedbush provides Direct Market Access to qualified clients who require the high performance and ultra-low latency networks. Our dedicated risk management team continually monitors trading activity ensuring proper risk levels at the trader, client and firm level.

**KFIX API**

Wedbush Futures' proprietary KFIX API offers advanced electronic trading capabilities that allow clients to integrate their management system, algorithmic black box, or third-party front end. As a single point of connectivity to exchanges and counterparties around the world, our KFIX API maximizes speed of execution and pre-trade risk management.

We also support APIs from other software vendors.

### C2. Defendant KCG's Website Advertisements

92. The advertisements and promotions under **(i) Wedbush Services** are similar to those of KCG Futures as at December 1, 2014, when KCG Futures, a wholly-owned subsidiary of KCG Americas LLC became Wedbush Futures, a wholly-owned subsidiary of Wedbush Securities, Inc. Hence, whatever is mentioned under **(i) Wedbush Services** is equally applicable to KCG, previous FCM to Plaintiffs.

93. As shown in paragraphs 91 and 92, both Clearing FCM-Defendants Wedbush and KCG claim "relentless service", "unparalleled dedication to your financial success", '[Our] broad market access, expertise, and integration with leading order management systems make us the best choice", "Our services and innovative tools were built on these [efficiency in operations, consistency in performance, and transparency in both process and economics] concepts to provide a complete solution that is unrivaled in the industry" and "To carefully monitor trading exposure, we utilize industry-leading real-time risk management controls". "Our dedicated risk management team continually monitors trading activity ensuring proper risk levels at the trader, client and firm level", and finally, "As a single point of connectivity to exchanges and counterparties around the world, our KFIX API maximizes speed of execution and pre-trade risk management. We also support APIs from other software vendors".

94. These advertisements and promotions by Clearing FCM-Defendants Wedbush and KCG are in sharp contrast to all the allegations against them ("Wedbush and KCG") for their grossly

1    dysfunctional Electronic Trading Facility, wanton inefficiency, callous recklessness, and unconscion-

2    able underperformance in their Commodity Futures Operations, throughout the relevant period. In

3    short, clearing FCM-Defendants Wedbush's and KCG's respective website Advertisements and

4    Promotions were Fraudulent Misrepresentations by Commission and Omission to Deceive to Induce

5    the Public and Commodity Futures Traders, including Plaintiffs, to use the ETMF Enterprise

6    Defendants' dysfunctional Electronic Trading Facility.

7                              ### C3. Defendant ION's Website Advertisements

8           95. ION Trading advertises and promotes its services, capabilities, capacities and technologies

9    on its website as follows:

10   "[ION is a global market leader in providing innovative, high performance, real-time solutions across
     multiple asset classes for electronic trading, position management, pricing, risk management and
11   downstream processing to clients which range from global financial institutions to leading niche
     financial specialists.

12   With offices in the leading financial centres of London, New York, Tokyo, Frankfurt, Paris, Madrid,
13   Toronto and further offices in Chicago, Singapore, Ireland, Italy, India and Australia, the company
     has a global reach enabling it to support customers' local needs wherever they are.

14   **Fault Tolerance**
15   The ION platform guarantees the availability of the system by using sophisticated process manage-
     ment procedures that allow for a flexible and dynamic allocation of processes on machines, and for
16   automatic reaction to failure (auto failover).

17   At the core of the High Availability features are the Process Manager (PM) and the Configuration
     Server (CS) components. These components respectively support the configuration of a platform
18   with automatic failover characteristics and the propagation of the platform events which trigger the
     failover reactions.

19   PM components and the ION APIs allow the configuration of automatic failover. PMs are also used
20   to distribute components across the various servers to balance the load]".

21          96. As shown in paragraph 95, Defendant ION Trading advertises and promotes itself as "a

22   global market leader in providing innovative, high performance, real-time solutions across multiple

23   asset classes for electronic trading, position management, pricing, risk management and downstream

24   processing to clients which range from global financial institutions to leading niche financial

25   specialists".

26          97. Defendant ION claims "innovativeness", "high performance", "real-time solutions" and

27   "risk management", which are in sharp contrast to the ETMF Enterprise Defend-ants' dysfunctional

28   Electronic Trading Facility, especially Defendant ION's horrendous RANorder Application Program-

1  ming Interface (API) and Backend Platform that connected the QST Front-end Platform to the

2  Commodity Futures Exchanges. The reckless and unconscionable underperformances of ION, its

3  consistent pattern of failure to route and match electronic orders in days, not to talk of real-time, and

4  its egregious risk management failures, solidly affirm Defendant ION's false Website Advertisements

5  and Promotions. In other words, ION's Website Advertisements and Promotions were Fraudulent

6  Misrepresentations by Commission and Omission to Deceive to Induce Commodity Futures Traders,

7  including Plaintiffs, to use the ETMF Enterprise Defendants' dysfunctional Electronic Trading

8  Facility.

9  *C4. Defendant QST's Website Advertisements*

10  98. Defendant Computer Voice Systems, Inc ("QST") advertises and promotes its trading

11  platform's capabilities, capacities and technologies on its website as follows:

12  "[Quick Screen Trading offers revolutionary software applications for real-time streaming futures and options on futures quotes, highly reliable and accurate data, internet based mobility for anytime-anywhere access, professional, advanced tools, the best combination of sophistication, usability, performance and price.

13

14

**Executive Overview**
15  QST is a revolutionary futures trading application that combines comprehensive, fast and flexible order entry/order management with world-class charting and analytics, real-time quotes and news.

16

17  Order entry is pervasive throughout QST. From virtually any screen, you can enter and manage orders and fills.

18  Integrated paper trading allows users to learn to use the interface and practice trading strategies. With the click of a button, users can toggle between paper and live trading. One application can consoli-date order flow on Ion Trading's RANorder, or Trading Technologies, and CQG's FIX Adapter, and soon to be OAK. This gives you the flexibility to route your order flow through a single network, fully utilizing its firm-wide risk control.

19

20

21

22  The very same application gives you fully redundant access to market data replacing Futuresource, eSignal, ProphetX, DTN or any other quote terminal products.

23  **Application Features**
24  Efficient, intuitive and consistent order entry: left click = buy, right click = sell. Unlike  other products that display useless eye candy, the order entry function is simple and  concise. It is truly a "single action" operation.]"

25

26  99. As shown in paragraph 98 above, Computer Voice Systems, Inc. ("QST") claims

27  "revolutionary futures trading application that combines comprehensive, fast and flexible order

28  entry/order management with world-class charting and analytics, real-time quotes and news", "From

virtually any screen, you can enter and manage orders and fills", "One application can consolidate

order flow on Ion Trading's RANorder .....{which}..... gives you the flexibility to route your order

flow through a single network, fully utilizing its firm-wide risk control.", and finally, " Efficient,

intuitive and consistent order entry, left click = buy, right click = sell. Unlike other products that

display useless eye candy, the order entry function is simple and concise. It is truly a "single action"

operation".

100. Throughout the preceding and succeeding Paragraphs of these allegations, the most

prominent standout is the totally dysfunctional Defendant ION Trading's RANorder API and

Backend that connect the QST Front End Platform to the Commodity Futures Exchanges. The highly

dysfunctional RANorder is the deadliest API, Plaintiffs have ever come across. It is thus shocking to

say the least, for Defendant QST to advertise that "One application can consolidate order flow on

ION Trading's RANorder ..... [giving] you the flexibility to route your order flow through a single

network. Defendant ION Trading's RANorder failed woefully to route Plaintiff's Electronic Trade

Orders in numerous instances and for 17 full months. This is Fraudulent Deceit and Fraudulent

Misrepresentation by Defendant QST.

101. Furthermore, Defendant QST claims, "Efficient, intuitive and consistent order entry: left

click = buy, right click = sell. Plaintiff Harry clicked the blue left button to buy or the red right button

to sell on numerous occasions during the relevant period, and the ETMF Enterprise Defendants

Electronic Trading Facility failed woefully to transmit Plaintiffs' electronic orders to the Commodity

Futures Exchanges or failed to transmit them in a timely manner. This is the crux of this case --

Defendant QST's false Advertisement on its Website to deceive and induce, and deceived and

induced Plaintiffs to move their Futures Account to Defendants.

102. Paragraphs 98, 99, 100 and 101 are in sharp contrast to the continuous failure of the

ETMF Enterprise Defendants' dysfunctional Electronic Trading Facility for 17 full months. In other

words, QST's Website Advertisements and Promotions were Fraudulent Misrepresentations by

Commission and Omission to Deceive to Induce the Public and Commodity Futures Traders,

including Plaintiffs, to use the ETMF Enterprise Defendants' dysfunctional Electronic Trading

Facility

103. QST's Website Promotions' and Advertisements' uncanny corroboration of Benz's representations of the ETMF Enterprise Defendants' Electronic Facility, coupled with the phenomenal performance of the DEMO, was what ultimately induced Draper and Harry to move their Commodity futures Trading Account from OEC/Daniels Trading to Defendants.

104. In September/October 2013, Plaintiff Harry asked Defendant Benz to recommend a California Commodity Futures Brokerage Firm that uses the QST Platform, the Front-end of the ETMF Enterprise Defendants' Commodity Futures Trading Facility. Benz recommended Main Street Trading, Inc ("MST") and Patrick Joseph Flynn ("Flynn"). Harry then contacted Flynn to get more details about MST and how the electronic order execution works at MST using the QST Front-end Platform. Just like Benz, Flynn told Harry that the DEMO and LIVE were very similar, and that with the click of a button, Harry could switch from the DEMO (Paper Trading) to the LIVE (Live trading). Flynn also added that the QST Front-end Platform was tightly and securely connected to the ION Trading API and Backend that connect to the Commodity Futures Exchanges like CME, CBOT and ICE. Flynn's MST website corroborates these statements with the following excerpts:

### C5. Defendant MST's Website Advertisements

> MSTonline features the ability to enter and manage orders and fills from virtually any screen. It also offers integrated paper trading, allowing users to learn the MSTonline interface and practice trading strategies. With the click of a button, users can toggle between paper and live trading.

105. The following email from Flynn on November 8, 2013 further corroborates Flynn's promise of the interconnectivity of QST to RAN (ION Trading, Inc.) and the Exchanges;

"P. O. A. & RETIREMENT & DISCLOSURE

Patrick Flynn
Fri 11/8/2013, 10:33 AM You; RONALD DRAPER (rsdraper@gmail.com)

Dear Ron and Bight,

Thank you both very much.  We are all set pending funding.  As you recall, I sent the wiring instructions and formal account number to you both yesterday afternoon.  I will contact once the account has been funded and will assist as best I can with helping to secure your connectivity with QST and RAN.

Regards,

Patrick Flynn

Main Street Trading
800 748-5083 ext 7450
949 268-7800

THE RISK OF LOSS IN FUTURES TRADING CAN BE SUBSTANTIAL.
THEREFORE, ONLY GENUINE RISK CAPITAL SHOULD BE USED FOR
TRADING PURPOSES. FUTURES AND FUTURE OPTIONS MAY NOT BE
SUITABLE FOR ALL INVESTORS. YOU SHOULD CAREFULLY CONSIDER YOUR
FINANCIAL CONDITION WHEN DECIDING WHETHER TO TRADE. PAST
PERFORMANCE, PROJECTED OR HYPOTHETICAL RESULTS ARE NOT
NECESSARILY INDICATIVE OF FUTURE RESULTS."

106. With these mouthwatering Promotions and Advertisements of the ETMF Enterprise Defendants KCG, Wedbush, ION, QST and MST on their respective websites touting or representing the superiority of the ETMF Enterprise Defendants Electronic Trading Facility, backed by the assurances and presentations by Benz and Flynn to Plaintiffs, in conjunction with the phenomenal performance of the DEMO in creating Exchange-Traded Spreads and Exchange-Traded Spread Charts, and its fast execution on the Simulated or Virtual Commodity Futures Exchanges, Defendants induced Draper and Harry to move their Commodity Futures Trading Account from OEC/Daniels Trading to Defendants. Thus, on November 6, 2013, the Trading, Account #TSMPF148 was opened with ETMF Enterprise Clearing-FCM Defendant KCG, and Plaintiff Draper wired $275,000 into the Account for Plaintiff Harry to start trading live on November 15, 2013.

107. Plaintiffs justifiably relied on the promotions and advertisements of KCG, Wedbush, QST, ION and MST because the ETMF Enterprise Defendants had superior knowledge of their Trading Facility, and Plaintiffs could not have discovered the dysfunctionality before opening their Trading Account with Defendants. The consequence of Defendants' Fraudulently False Promotions and Advertisements was the huge $125 million Financial Loss by Plaintiffs, as at June 30, 2019, and also breach of obligations by Defendants.

## D. DEFENDANTS' BREACH OF OBLIGATION

### D1. ETMF Enterprise Defendant KCGs' Breach of Obligation to Draper, With Contract Under California Civil. Code §§ 1709, 1710, 3300 and 3333

108. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein